UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------X
VASILIOS MESIMERIS,

                    Plaintiff

        -against-                    MEMORANDUM, DECISION
                                     AND ORDER AFTER BENCH TRIAL
THE UNITED STATES OF                 03-CV-0925(JS)
AMERICA,
                    Defendant.
----------------------------X

APPEARANCES:

For Plaintiff:      Daniel Flanzig, Esq.
                    Flanzig and Flanzig, LLP
                    323 Willis Avenue, P.O. Box 669
                    Mineola, NY 11501-0669

For Defendant:      Vincent Lipari, Esq.
                    United States Attorneys Office
                    Eastern District of New York
                    610 Federal Plaza, 5th Floor
                    Central Islip, NY 11722-4454

SEYBERT, District Judge:

INTRODUCTION

        On May 9, 2001, Plaintiff Vasilios Mesimeris
("Plaintiff") was loading packages into the trunk of his car when
he was struck from behind by an unattended United States Postal
Service ("USPS") truck.  On February 25, 2003, Plaintiff commenced
the instant action against Defendant United States of America
("Defendant") pursuant to the Federal Tort Claims Act ("FTCA"), 28
U.S.C. § 1346(b).  The facts constituting Defendant's negligence
are not disputed.  The only remaining issues for this Court to
decide are whether Defendant's negligence caused Plaintiff to incur
a serious injury and, if so, the appropriate amount of damages.

Between September 26 and September 29, 2005, this Court presided over a three-day bench trial concerning causation and damages. Based upon the evidence and arguments presented, the Court makes the following findings of fact and conclusions of law pursuant to Rule 52(a) of the Federal Rules of Civil Procedure. To the extent that any of the findings of fact may be deemed conclusions of law, they also shall be considered conclusions. Likewise, to the extent that any of the conclusions of law may be deemed findings of fact, they shall be considered findings. <u>See</u> <u>Miller v. Fenton</u>, 474 U.S. 104, 113-14, 106 S. Ct. 445, 451-52, 88 L. Ed. 2d 405, 413-14 (1985) (noting the difficulty, at times, of distinguishing findings of fact from conclusions of law).

<u>FINDINGS OF FACT</u>

Plaintiff is a periodontic surgeon. He is presently thirty-nine years old (thirty-five at the time of the accident) and is married with two children. His medical practice is located in Babylon, New York. (Tr. at 5-6.) To date, Plaintiff still practices dental surgery.

On May 9, 2001, Plaintiff was struck by a USPS truck. He was outside the Americana Shopping Center in Manhasset, New York when the accident occurred. The circumstances of the accident are not seriously disputed. Plaintiff was at the rear of his car, loading packages into the trunk. He became distracted by mud-prints on the right (passenger) side of his car and leaned over for

a closer inspection. While in the process of straightening up, Plaintiff was struck from behind by the USPS truck. (<u>Id.</u> at 7-9.) The USPS truck was unattended and had, inexplicably rolled towards Plaintiff and his car. Plaintiff had no opportunity to see the truck prior to impact. (<u>Id.</u> at 8-9). He was struck on the upper left portion of his back, and was spun clockwise until he was facing the truck. Plaintiff was knocked off balance, but was never thrown to the ground. The USPS truck came to a stop when it hit Plaintiff's automobile. The force of the impact was sufficient to push Plaintiff's automobile out of its parking space. (<u>Id.</u>)

In the moments following the accident, Plaintiff felt pain in his left shoulder and upper arm. He described the pain as "nothing too dramatic," but states that his ability to provide an accurate description of the pain at that time was compromised by shock. (<u>Id.</u> at 215, 230.) Plaintiff refused immediate medical attention (i.e., an ambulance). Instead, he opted to go home and rest. That evening, Plaintiff telephoned his primary care physician who recommended that Plaintiff take some ibuprofen and rest.

Over the next few days, Plaintiff's discomfort increased. (<u>Id.</u> at 13.) Initially, the pain was centralized in his upper left back and shoulder. Neck pain commenced one to two days after the accident. Notwithstanding the pain, Plaintiff continued to go to work. It is undisputed that Plaintiff did not have any abrasions,

bruises or other superficial injuries as a result of the accident.

On May 14, 2001, Plaintiff visited Dr. David Weissberg, an orthopedic surgeon. Dr. Weissberg's initial examination of Plaintiff included a review of Plaintiff's medical history and x-rays. Dr. Weissberg's diagnosis was that Plaintiff suffered from cervical radiculitis[1] and sprain, along with sprains of the left shoulder and lower back. (Ex. 6.) Dr. Weissberg also noted that Plaintiff's x-ray indicated "degenerative disc disease from the C4 through C7 levels." (Id.) Dr. Weissberg prescribed painkillers and physical therapy. Plaintiff began physical therapy at Park Avenue Physical Therapy in Huntington under the care of Dave Fisher. Immediately after the initial visit, Plaintiff contacted Dr. Weissberg about enhanced pain. Dr. Weissberg directed Plaintiff to undergo a Magnetic Resonance Imaging exam ("MRI").

The MRI was "open." The description "open" refers to the fact that a patient is not required to be enclosed in a tube during the exam. The procedure is provided as an accommodation for patients that have claustrophobic tendencies. An "open" MRI is contrasted with a "closed" MRI, which requires enclosure. While the "open" MRI provides a useful means of diagnosing injuries, it does not provide the most detailed image available. The "closed"

---

[1] Radiculitis is "inflammation of the root of a spinal nerve, especially of that portion of the root which lies between the spinal cord and the intervertebral canal." Dorland's Illustrated Medical Dictionary, www.mercksource.com/ pp/us/cns/cns_hl_dorlands.

MRI provides superior imaging because it allows for the more effective use of magnets that provide the imaging. (Id. at 117.)

The open MRI indicated that Plaintiff had "cervical spondylosis with osteophyte formation." (Ex. 13.) Plaintiff had osteophytes[2] at the C4-C5 level of his vertebrae. At the C6-C7 level, the MRI showed that Plaintiff had "a right paracentral osteophyte . . . and a possible small annular tear." (Id.)

Plaintiff continued under the care of Dr. Weissberg until March 2002. The general course of treatment was physical therapy and anti-inflammatory drugs. In March 2002, Plaintiff was referred to Dr. Eric Mermelstein, a spinal surgeon, because of neck pain and the onset of numbness in his right hand. Dr. Mermelstein testified at trial as a treating physician and was also qualified as an expert in the area of orthopedic and spinal surgery. (Tr. at 111.)

Dr. Mermelstein first examined Plaintiff on March 20, 2002. (Id. at 113.) According to the initial medical history taken by Dr. Mermelstein, Plaintiff was working full-time, but had changed his practice significantly due to the weakness and pain in his hand. The "mechanism of the [May 2001] accident" was described in the history taken by Dr. Mermelstein as "a runaway mail truck . . . barreling down [on Plaintiff that] hit him in the back and slammed him into the back of his car." (Ex. 7; see also Tr. at

---

²       Osteophytes are bony formations. (Tr. at 358.) They are more commonly known as "bone spurs." (Tr. at 125.)

-5-

113-14.) "[Plaintiff] was tossed out of the way and had multiple contusions and superficial injuries." (Ex. 7)

As part of the initial visit, Dr. Mermelstein reviewed Plaintiff's May 2001 MRI. (Tr. at 116.) Based upon the MRI, Dr. Mermelstein found that Plaintiff had some "mild degree of cervical spondylosis." He also noted, "[t]here is some question of small annular tear[3] and a small right paracentral protrusion at C6-7." (Id.) Finally, Dr. Mermelstein reported that the MRI indicated no significant degree of neural compression, i.e., no significant pain through neural compression. (See Id. at 116, 166-167.)

Dr. Mermelstein's initial impression was that Plaintiff suffered from myofascial (muscle-related) back pain, and, perhaps, suffered from disc-related neck pain. (Id. at 116.) He recommended that Plaintiff continue physical therapy, and ordered an EMG nerve conduction study. (Id.) At trial, Dr. Mermelstein testified that he recommended the EMG to determine the etiology, or cause, of Plaintiff's hand complaints. (Id. at 121.) Dr. Mermelstein testified that Plaintiff's complaints, at the time, were consistent with a "nerve injury, or a pinched nerve . . . in the cervical spine." (Id.)

The EMG was performed on May 10, 2002. The test results were "consistent with a mild acute cervical radiculopathy with

---

[3]    Annular tear refers to a tear in the tissue surrounding a disc.  Such a tear is usually traumatic in origin and results in the weakening of the disc.  (Tr. at 116.)

active denervation in the C6-7 nerve root distribution." (Id. at 122.) The significance of the finding of denervation at this level was that it would explain the Plaintiff's neck and arm/hand difficulties. (Id.)

Plaintiff next visited Dr. Mermelstein on May 22, 2002. During the visit, Dr. Mermelstein reviewed the EMG results with Plaintiff. Plaintiff reported to Dr. Mermelstein that he continued to experience strength and motor coordination problems with his right arm and hand. Dr. Memelstein examined Plaintiff's right hand and determined that, notwithstanding Plaintiff's complaints, there was no objective indication of weakness in that area. (Ex. 7.) Dr. Mermelstein noted, however, that Plaintiff's injury "has certainly been quite bothersome and has been fairly devastating to his surgical career. All objective data had pointed to the fact that this is a chronic radicular syndrome and further treatment will be based on whether or not his discs have regressed or progressed over the past year." (Id.)

Based on the test results and Plaintiff's continued complaints, Dr. Mermelstein recommended that Plaintiff undergo a second MRI. This MRI was "closed." The second MRI revealed a "soft tissue protrusion" that, according to Dr. Mermelstein, caused a displacement of Plaintiff's spinal cord at the C6-7 level. (Tr. at 124.) At trial, Dr. Mermelstein explained that the material was most likely "disc material or herniated disc," as opposed to an

osteophyte. (Id. at 124-25.) Dr. Mermelstein found that any signs of degeneration found on the MRI were typical of someone Plaintiff's age. (Id. at 125.) Dr. Mermelstein opined that "it is clear that [Plaintiff, at that time] had a right sided C6-7 herniation." (Tr. at 126.)

After undergoing the second MRI, Plaintiff continued under Dr. Mermelstein's care. The treatment objective was pain management - in order to remedy Plaintiff's symptoms short of surgery. (Id.) Dr. Mermelstein's associate, Dr. Sanelli administered two epidural injections to the C6-7 levels of Plaintiff's vertebrae. The procedures were performed on October 16, 2002 and October 30, 2002. (Id. at 127-28.) Plaintiff did not obtain any relief as a result of the injections. Actually, the second injection worsened his condition. (Id. at 128.)

With other alternatives failing, surgery was becoming the only viable option to remedy Plaintiff's difficulties. Dr. Mermelstein ordered that Plaintiff undergo a second closed MRI, on November 7, 2002, to determine whether Plaintiff's condition had changed. Having concluded there was no substantial difference, Dr. Mermelstein discussed with Plaintiff the possibility of a surgical intervention. (Id. at 130.)

In December 2002, Plaintiff sought out Dr. Frank Cammisa, a surgeon affiliated with the renown Hospital For Special Surgery for a surgical consult. (Id. at 25.) Dr. Cammissa initially

reviewed Plaintiff's medical records.  His initial impression was that Plaintiff suffered from cervical spondylosis, C6-7, with right C6-7 radiculopathy and spondylosis at C4-5.  (Ex. 10.)  He indicated that the C6-7 spondylosis was the primary cause of Plaintiff's difficulties, and that the C4-C5 spondylosis was not "clinically relevant at this time." (Id.)  Dr. Cammisa referred Plaintiff for a CAT scan myelogram ("CT myelogram")[4] and advised him that they would discuss surgical procedures after reviewing the results.

The CT myelogram revealed "significant cervical problems at C6-7." (Id.)  Dr. Cammissa's impression was that Plaintiff's "major problem" was cervical spondylosis at C6-7 with right arm radiculitis.[5]  (Id.)  Dr. Cammisa reviewed the CT myelogram and discussed it with Plaintiff on February 3, 2003.  Notwithstanding the repeated indications of spondylosis in Dr. Cammissa's report, Plaintiff does not recall him ever using that term.  (Tr. at 248-49.)  According to Plaintiff, during the consult Dr. Cammissa intimated that the accident caused his disc herniation. (Id. at

---

[4]    A CT myelogram differs from an MRI in that it highlights the existence of bony structures.  (Tr. at 131, 384.)

[5]    The Parties' experts proffer differing interpretations of CT melogram.  Dr. Mermelstein testified that the test did not illustrate significant long-standing or degenerative changes and that the displacement of Plaintiff's vertebrae at the C6-7 level was due to a soft tissue protrusion.  (Tr. at 132 ) Dr. Rosen agreed with Dr. Cammissa's assessment that Plaintiff's major problem was "cervical spondylosis." (Tr. at 385.)

276.)

After a discussion with Dr. Cammissa, Plaintiff decided to undergo an anterior cervical microsurgical decompression and fusion of the C6-7 level. (_Id._ at 28-30.). The procedure was performed by Dr. Cammissa on March 4, 2003. (Exs. 11, 12; Tr. at 30.) His operative notes provide, in relevant part:

> Preoperative neurologic exam revealed a significant right C6-7 radiculopathy. EMG's showed evidence of radiculopathy at C6-7. Plain radiographs revealed evidence of spondylosis at C4-5 and C6-7. MRI revealed evidence of spondylosis and a disc herniation to the right at C6-7. There was mild disc bulging at C4-5. CT/myelogram corroborated.

> It was felt that the symptomatic level was C6-7 and at surgery this level was approached. The C4-5 level was not felt to be clinically significant and therefore it was not addressed at the time of the surgery.

> At surgery the Leica operating miscroscope was utilized. There was significant spondylosis. There was a disc herniation at C6-7. The disc herniation was to the right into the foramen at C6-7 compressing the right C7 nerve root. Anterior cervical decompression was done at C6-7 with removal of both osteophyte and disc material. With removal of disc material and the osteophytes at this level, satisfactory decompression was accomplished.

(Ex. 11.)

Plaintiff was hospitalized for three days as a result of the procedure. (Tr. 30-34.) The visible remnants from the surgery

are scars on Plaintiff's neck and hip. (Ex. 3.)[6] After discharge from the hospital, Dr. Cammissa put Plaintiff on a recovery schedule that included physical therapy and pain medication. The goal was for Plaintiff to gradually return to his full work-load. The initial results indicated that the surgery was a success. (Tr. at 137, 139.) Plaintiff immediately regained strength in his right hand and his neck pain improved approximately 80%. (Id. at 251.) The neck pain, however, never subsided. Dr. Cammissa explained to Plaintiff that he "had a bad job (i.e., one that requires leaning over patients) for this type of injury." (Id. at 41.) Over the next year, as Plaintiff attempted to return to his full work-load, his neck pain increased and the pain and weakness in his hand resurfaced. Plaintiff notified Dr. Cammisa of the progressive pain.

Dr. Cammissa ordered that Plaintiff undergo CT scans, and MRIs in order to diagnose the persisting problems, but the tests indicated that the surgery was a success. (Id. at 42-43.) Dr. Cammisa originally recommended that Plaintiff work through the pain, but later recommended that Plaintiff reduce his work surgery schedule and visit a neurologist. He also suggested that Plaintiff visit an acupuncturist. Eventually, after exhausting Dr. Cammisa's recommendations, Plaintiff returned to Dr. Mermelstein on July 28,

---

[6]     Dr. Cammissa grafted/harvested bone from Plaintiff's hip to use in the fusion procedure. (Tr. at 30-33.)

2004.

Dr. Mermelstein agreed with Dr. Cammissa — the surgery was a success. Because of Plaintiff's persistent complaints of neck and arm pain, Dr. Mermelstein ordered another EMG test. According to Dr. Mermelstein, the April 29, 2005 EMG revealed "moderate chronic radiculopathy on the right side." (<u>Id.</u> at 142.) The chronic condition was "secondary to a herniated disc at C6-7." (<u>Id.</u>)[7] The EMG showed "no evidence of either active denervation or reinnervation." (<u>Id.</u> at 143.) This meant that Plaintiff's condition was not going to improve; the only remaining course of treatment was pain management. (<u>Id.</u> at 143-44.) Dr. Mermelstein referred Plaintiff to a pain management specialist, Dr. Fandos (<u>Id.</u> at 48; <u>see also</u> Ex. 21.) At Dr. Fandos' suggestion, Plaintiff carries with him a portable TENS unit. (Tr. at 50.) The TENS unit is a small battery operated machine that emits electrical current to Plaintiff's neck, numbing the area and relieving the pain. (<u>See</u> <u>id.</u>)

At trial, Dr. Mermelstein testified that the May 2001 accident was the cause of Plaintiff's "neck injury, cervical spine injury, causing herniated disc at C6-7." (<u>Id.</u> at 146, 148.) He

---

[7] The diagnosis that Plaintiff had continuing problems at the C6-7 level is not contradictory of the opinion that the surgery was successful. If the nerves at Plaintiff's C6-7 level had been damaged or severed prior to the surgery, then function would not return. The fusion would only rehabilitate viable nerves that had been compressed. Once the compression was relieved, function would return. (Tr. at 395.)

specifically opined that the mechanism of injury "c[ould] very well cause a disc in a cervical spine of a grown male to herniate, and . . . cause all the findings [in the] MRI, EMG, physical [examinations] and operative notes." (Id. at 148.) Dr. Mermelstein testified that, as a result of the accident, Plaintiff still suffers from a significant and permanent limitation in the use of his neck and hand, and might require additional surgery in the future. (Id. at 147-49.)

Dr. Mermelstein's opinion was countered by the testimony of the Government's expert, Dr. Arthur Rosen. Doctor Rosen examined Plaintiff for the purposes of trial and was designated an expert in the field of neurology.

Dr. Rosen opined that the accident on in May 9, 2001 as described by Plaintiff could not have caused Plaintiff's continuing neck and hand injuries. He classified the impact as "trivial," and explained that, had Plaintiff sustained a herniation, he would have been in immediate, excruciating pain. (Id. at 364-367.) If Plaintiff had sustained an annular tear, he would have experienced "acute pain." (Id. at 368-69.)

Further, Dr. Rosen testified that, if Plaintiff had suffered a herniated disc as a result of the May 2001 accident, the first, open MRI would have shown disc material, "free and clear" of the osteophytes located at the C6-7 level. (Id. at 364-66.) This was not the case. He reviewed Dr. Sanelli's EMG study of May 10,

2002 and explained that the nerve problems with Plaintiff's hand and neck problems had commenced, at most, as early as January 2002 - more than six months after the accident. (Id. at 377.) He further testified that a course of treatment involving physical therapy was inconsistent with a finding of acute herniation, (id. at 371), and that Plaintiff's pain in the days following the accident was purely muscle-related.

According to Dr. Rosen, Plaintiff's difficulties with his neck and hands are caused by his degenerative disc disease, also referred to as spondylosis. (Id. at 350-57; see also id. at 163-64 ("spondylosis is a fancy medical word for degenerative disc disease . . . they are one and the same"), 473-74 (explaining that spondylosis is secondary to degenerative disc disease).) Disc disease refers to the dehydration of the discs that are located between the vertebrae. When the discs become dehydrated, they lose elasticity and the vertebral bodies that the discs separate rub up against each other and create osteophytes. (Id. at 357-59, 382-83.) Degenerative disc disease is not caused by trauma; osteophytes form gradually over several years. As osteophytes build up, they can cause herniation, as disc material is forced out over time. (Id. at 380.) All people experience some degree of degenerative disc disease due to general wear and tear over time, but according to Dr. Rosen, Plaintiff's condition was exceptional. It was evidenced by the formation of osteophytes at C4-5 and C6-7.

Dr. Rosen testified that Plaintiff's current neck pain and arm weakness limitations are caused, by both the residual effects of his C6-7 difficulties, and his progressive degenerative disc disease. (Id. at 395-96, 405.)

## CONCLUSIONS OF LAW

### I. Applicable Law

This action was commenced pursuant to the FTCA. Accordingly, because the accident complained of occurred in New York, New York substantive law governs the resolution of this action. See 28 U.S.C. § 1346(b)(1) (providing that, in tort suits against the United States, liability is determined "in accordance with the law of the place where" the alleged tort occurred); Chen v. U.S., 854 F.2d 622, 625-26 (2d Cir. 1988); Goldstein v. U.S., 9 F. Supp. 2d 175, 186 (E.D.N.Y. 1998). Because this action concerns injury inflicted by a motor vehicle, New York's "no fault" insurance ("No Fault") law controls the issues of liability and damages. See N.Y. Ins. L. § 5101, et seq.

Under New York's No Fault regime, injured parties are compensated, irrespective of fault, by automobile insurance providers for "basic economic loss occasioned by"[8] a motor vehicle

---

[8] Basic economic loss includes expenses incurred for medical treatment and other reasonable expenses and compensation for lost wages. The amount is capped at $50,000.00. N.Y. Ins. L. § 5102. As recognized by the New York Court of Appeals, the fact that basic economic loss has remained capped since 1973 provides incentive to litigate." Pommells, 4 N.Y.3d at 571.

-15-

accident in New York.  Pommells v. Perez, 4 N.Y.3d 566, 572, 797

N.Y.2d 380, 830 N.E.2d 278 (2005).  "Only in the event of a serious

injury as defined in the statute can a person initiate suit against

the car owner or driver for damages caused by the accident."  Id.;

see also N.Y. Ins. L. §§ 5102-04.

> Serious injury is defined by the No Fault statute as:
>
> > a personal injury which results in death;
> > dismemberment; significant disfigurement; a
> > fracture; loss of a fetus; permanent loss of
> > use of a body organ, member, function or
> > system; permanent consequential limitation of
> > use of a body organ or member; significant
> > limitation of use of a body function or
> > system; or a medically determined injury or
> > impairment of a non-permanent nature which
> > prevents the injured person from performing
> > substantially all of the material acts which
> > constitute such person's usual and customary
> > daily activities for not less than ninety days
> > during the one hundred eighty days immediately
> > following the occurrence of the injury or
> > impairment.

N.Y. Ins. L. § 5102 (d).  The burden of proving a serious injury

rests upon the party seeking additional recovery.  In order to

obtain recovery outside the No Fault scheme, a party must prove

that they experienced a serious injury, and the injury was caused

by Defendant's conduct.

II.  Application

Plaintiff seeks to avoid the constraints of the No Fault

recovery regime.  He argues that he has suffered a "serious injury"

because he has permanently lost the regular use of his neck and

right hand, and/or suffered a permanent limitation in the use of

-16-

his neck and right hand as a result of the May 2001 accident. The Government does not seriously dispute that Plaintiff suffers from a serious limitation in the use of his right hand and a restricted range of motion in his neck. The Government argues, however, that the May 2001 accident could not have caused Plaintiff's limitations. After reviewing the record, the Court finds that Plaintiff has failed to demonstrate that his injuries were the result of the May 2001 accident, and not the result of an active degenerative condition in his cervical spine. The Court, therefore DISMISSES Plaintiff's claims.

Before discussing the reasons for this determination, the Court points out that this was an extremely close case, requiring a difficult determination. The Plaintiff clearly is a hard working individual. He has unfortunately been limited by a condition in his spine. This Order should in no way be construed as questioning the legitimacy of his injuries.

In the end, this case boiled down to a battle of the experts. Plaintiff relied on the opinion of Dr. Mermelstein, and Defendant relied on the opinion of Dr. Rosen. Dr. Mermelstein is Plaintiff's treating physician and, as such, is indisputably in the best position to offer an opinion concerning Plaintiff's injuries and their cause. In most cases, the Court would attribute greater deference to his opinion.

However, the testimony adduced at trial established that

Dr. Mermelstein's opinion was predicated upon an erroneous description of the accident. Based on the record before this Court, it cannot seriously be challenged that Dr. Mermelstein presumed a far more significant impact between Plaintiff and the USPS truck than Plaintiff testified to at trial. Dr. Mermelstein presumed that the USPS truck had slammed Plaintiff into the back of his car, and that Plaintiff suffered multiple contusions as a result of the impact. Neither of these assumptions were correct. At trial, Dr. Mermelstein conceded that the absence of such facts would have impacted his opinion. (Tr. at 155-56.) The record does not reveal any opinion from Dr. Mermelstein indicating that, had the accident occurred as indicated at trial, a herniation or annular tear would have resulted. The lack of such testimony dovetails with Dr. Rosen's testimony that a person who experienced a herniation or annular tear would have been in more immediate severe pain than Plaintiff at the time of, and in the days following the accident. In addition, the lack of such an opinion renders Dr. Rosen the only expert to proffer an opinion concerning Plaintiff's condition based upon an accurate factual predicate.

Moreover, Dr. Rosen's opinion was consistent with both the mechanism of the accident and the medical records. It is not seriously disputed that the May 2001 MRI showed that osteophytes had formed at the C4-5 and C6-7 level of Plaintiff's spine prior to the May 2001 accident. Indeed, Dr. Mermelstein himself noted,

based upon his examination of the open MRI, the presence of osteophytes at C4-5 and C6-7. Osteophytes are the by-product of degenerative disc disease, or spondylosis. The record indicates a gradual deterioration of Plaintiff's functioning from May 2001 until May 2002, when Plaintiff first went to see Dr. Mermelstein. While the closed MRI ordered by Dr. Mermelstein in 2002 revealed herniation, it also revealed osteophytes. As explained by Dr. Rosen, the formation of osteophytes can cause the herniation, secondary to what he referred to as a disc-bone complex. The EMG test performed by Dr. Mermelstein showed nerve damage of a recent vintage that post-dated the accident by, at a minimum, six months.

Most compelling, however, is that Dr. Rosen's opinion is closely aligned with the observations of Plaintiff's surgeon, Dr. Cammissa. Prior to the fusion, Dr. Cammissa indicated that his "major finding" was "cervical spondylosis." (Ex. 10.) His observation of Plaintiff's spine during the fusion procedure confirmed that Plaintiff had "significant spondylosis." (Ex. 11.)[9] Both Parties' experts agree that Dr. Cammissa, during the surgical procedure, was in the best position to observe the problems with Plaintiff's spine; accepting Dr. Mermelstein's testimony that "spondylosis" is a fancy word for degenerative disc disease, the

_____

[9]     Dr. Cammissa's only notation of Plaintiff's accident states that "his current complaints began in May 2001, when he was struck by a truck while putting packages into his trunk." (Ex. 10 at 2.)

Court is hard-pressed to draw any conclusion except that Dr. Rosen's findings are consistent with Dr. Cammissa's well-founded determinations.[10]

For the foregoing reasons, the Court adopts Dr. Rosen's opinion and dismisses Plaintiff's claim. In reaching this conclusion, the Court recognizes the "settled principle of tort law that when a defendant's wrongful act causes injury, he is fully liable for the resulting damage even though the injured plaintiff had a preexisting condition that made the consequences of the wrongful act more severe than they would have been for a normal victim." Maurer v. U.S., 668 F.2d 98, 99-100 (2d Cir. 1981). But this principle of liability must be carefully applied along with fundamental principles of causation - particularly where, as here, the claims arise under the No Fault regime. As recently recognized by the New York Court of Appeals:

> plaintiffs [in three separate cases pending before the court] claim to have suffered soft-tissue injuries--herniated discs--caused by car accidents, challenging us once again to articulate criteria that will enable serious injury claims to proceed yet prevent abuses that clog the courts and harm the public. We conclude that, even where there is objective medical proof, when additional contributory factors interrupt the chain of causation between the accident and claimed injury--such

---

[10]     The most troubling issue for the Court is whether the May 2001 accident caused an annular tear that later evolved into a disc herniation.  That diagnosis, however, was never confirmed; and Dr. Mermelstein's failure to proffer an opinion based upon an adequate factual predicate fatally flaws this claim.

> as a gap in treatment, an intervening medical
> problem or a preexisting condition--summary
> dismissal of the complaint may be appropriate.

Pommels, 4 N.Y.3d at 572.

After considering the nature of the impact, the gradual evolution in the severity of Plaintiff's symptoms, the opinions of the experts, Plaintiff's well-established spondylosis, and the fact that Plaintiff's condition improved after the surgery and later deteriorated once more, the Court finds the chain of causation interrupted by Plaintiff's degenerative disc disease. To find otherwise, the Court would have to engage in the logical fallacy, "post hoc, ergo propter hoc." Literally translated, the phrase means "after this, therefore on account of this." It refers to the erroneous assumption that, because an earlier event preceded a latter event, the earlier event must have caused the latter event. The Plaintiff here is not entitled to such a presumption. Plaintiff must establish, by competent medical evidence, that, more likely than not, his serious injury was caused by the May 2001 accident. The Court finds that he has not done so.

Having concluded that Plaintiff's injuries were not caused by the May 2001 accident, the Court DISMISSES Plaintiff's negligence claims.

## CONCLUSION

For the reasons explained above, Plaintiff's negligence claims are DISMISSED. The Court directs the Clerk of the Court to

enter judgment in favor of Defendant and mark this matter as CLOSED. The parties are directed to contact Mr. Charles Baran, Courtroom Deputy to make arrangements for retrieval of all exhibits. If no arrangements have been made within thirty days of receipt of this Order, the exhibits will be discarded. The Clerk of the Court is directed to mark this matter as CLOSED.

Dated:    Central Islip, New York
          January <u>17</u>, 2006

                              SO ORDERED.


                              <u>/s/ JOANNA SEYBERT    </u>
                              Joanna Seybert, U.S.D.J.